I'm going to announce the case and now that we're going into it formally, it's number 20-1307, Kengerski v. Harper and County of Allegheny. Ms. Coleman and Ms. Lamb, and then Ms. Scott and Ms. Liebenguth, or whatever, could you tell me again how to pronounce the name? Sorry, is it Ms. Liebenguth? Liebenguth? Yes. Yes, Your Honor. Got it. Got it. Okay. At least I was semi-close. Ms. Coleman, whenever you're ready. Thank you, Your Honor. Your Honor, my name is Maggie Coleman. I'm a police of the court. I represent Jeffrey Kengerski, the appellant, in this action. Your Honors, Title VII and our other employment discrimination statutes simply cannot work unless employees feel that they are protected and will be protected from retaliation if they make complaints and report of racial misconduct within the workplace. One question at the outset is, does it hurt your case that Ms. McCall, from whom the comments really came from primarily, was a co-worker in 2014 with Mr. Kengerski and she wasn't a supervisor at the time she made the racially offensive comments and sent the text messages? I don't think that that does hurt our case. I don't think it affects our case because, and I want to make this very clear from the outset, this is not a hostile work environment case. Mr. Kengerski does not have any hostile work environment claims in the case. The only thing that we're dealing with here is retaliation. The only thing we're dealing with is whether or not Mr. Kengerski should be protected for reporting the kinds of conduct that he reported about Ms. McCall and our argument would be that he absolutely should because what he was aware of that McCall was doing gave him a reasonable belief that she was engaged in employment discrimination. He knew that she had made blatantly racist comment to him about his young biracial relative and then followed that up with numerous racist text messages directly implicated her subordinates. Ms. Coleman, so your theory is that this is retaliation for reporting and it's premised on associational discrimination. And where in Kengerski's letter, though, did he show concern that his black co-workers were being harassed? So I think that that is implicit in the text messages that he attached. I think it's very important. Okay, but his complaint. Let's ask about his complaint. I mean, I guess your theory is the text messages are attached. What is it that allows us to say there's a fair, reasonable implication that this is about his co-workers, about the text messages? Is it because they have the names of a couple of co-workers attached to the letter? I think that his complaint should be read overridingly as a complaint about Maid McCall and about her behavior in the workplace. And it includes both her behavior towards him in terms of the racist comment about his niece, and the racist comments that are made in the text messages, the fact that they were directed towards him soon after the comment about his niece, but also the fact that they implicate her subordinates. Okay, but I want to pin down, it's clearly about McCall, but the district court said Kingarski could not have been harassed because he was white. Where does the opening brief respond to that argument? Where does it say, no, this is really about me because of an interracial family? I did not see your brief preserve this argument at all. So we did not, in my opening brief, I did not address directly the associational discrimination claim, but our contention is, and has always been, or I should say associational discrimination theory, our claim has always been, our contention has always been that Mr. Kingarski's letter, however you interpret that letter, whether you interpret it as a complaint about harassment against him because of the comment about his niece, or whether you interpret it as a complaint more generally about McCall's conduct in the workplace, or complaint events about her conduct towards his coworkers, however you interpret that, he had a reasonable good faith belief based on the racist comments being made by a very senior jail official that there was a hostile work environment either currently occurring or in progress. Okay, so let's talk about- And that kind of conduct should be protected. Let's assume we overlook what may well be a forfeiture here, all right, and we can talk with the EEOC about that. We have one comment. It's not clear if it's January, February 2014, the monkey on the hip comment. Very offensive, but one comment. Then we've got, we could argue about the February 10th text and the reference to Dennis Rodman. We have a text with three images February 28th, and then we have another text with three images in like April. So this is either two or three bursts of text depending on whether we count the February 10th one, which is ambiguous at best. What is it that that makes that sufficiently severe, you know, under Castleberry? It's not, it doesn't involve a supervisor making threats like Castleberry, and if it's not that severe, then what is it that makes it pervasive if we're talking about three or four instances over a four-month period that's six-plus months before the complaint? How is it that that is protected such that then complaining about it is protected activity under Title VII? I believe that that is protected because it demonstrates that Mr. Konderski, it demonstrates Mr. Konderski that there is a senior official, a very high-level official at the jail who But at the time she makes these statements, he's not yet a supervisor, and there are three or four over four months. What is it that, if you're not disputing that this doesn't meet the Castleberry level of severity, what makes it pervasive? Why should we treat three or four over four months, at least, you know, almost a year, six months, whatever, before the complaint as pervasive? I would point out, Your Honor, that it is not just a couple, I would point out that he is not required under this court's decision anymore to actually prove that the conduct he witnessed and that he reported was severe or pervasive. He has to show a reasonable belief that it meets that standard. He's got one, he's got one comment that's clearly addressed to him and his interracial family, the very offensive monkey on the hip comment. Then we've got three texts that don't appear to relate to him directly at all. How does he even have a reasonable belief that this is pervasive? I think under Castleberry, Castleberry stands for the proposition that a single racist comment made in the workplace can be, under some circumstances, could be severe. If it's a supervisor, coupled with, I'm going to fire you, all right? So maybe you can dispute the unsevere and say this is like Castleberry, I've got my real questions about that, but if it's not like Castleberry, then you've got to show pervasive. Show how it's reasonably perceived to be either of them. Mr. Konderski is not a lawyer, and he's not required to be a lawyer, so he's not required to know things like what the court's holding in Castleberry's decision was or would be a couple of years later. The only thing that he's required to do is be reasonable in his belief that there's an unlawful employment practice occurring. And even the lower court acknowledged that McCall's conduct was racist, that it was offensive, and that Mr. Konderski was correct to have reported it to his supervisors. And so to put him or any other employee in a position where they can reasonably perceive racist conduct going on in the workplace and be reasonable in reporting it, but then deny them protection for that later, it puts employees in a very difficult position, and it undermines the whole purpose of Title VII, which is to make sure that when this kind of stuff is occurring, that employers are aware of it and able to address it, which is exactly what That actually tees up a timing question. Why did it take nearly a year for him to complain about it? I think it was closer to nine months. And I think that, you know, this is a summary judgment motion, and we are entitled to all reasonable inferences that can be drawn from the record. And the record contains facts and information from which you could reasonably infer that he made the complaint when he did. And that is specifically because in the intervening months, McCall, who was a captain and who was his co-worker at the time, becomes his supervisor. And when she becomes his supervisor, he begins to subject her to very punitive, very vindictive employment practices and supervisory practices. But OK, so that it sounds like a very racially offensive comment went many months before there was even a complaint to the to the warden, Harper. And so I'm trying to figure out why I mean, OK, just the fact that McCall becomes his supervisor means it's OK, it's now the triggers, the need for him to make the the be, hey, something was said that I find really quite offensive about my family and it was racially offensive. What's that? Why not make the complaint the next day? Why wait nine months? There's nothing in the record that explains why, you know, where she testifies, was asked or testified, why did you not report this immediately? But I think what's important is that, you know, in some of the cases discussed, a person doesn't know when the first comment is made, what's going to follow. So he doesn't know when that little monkey comment is made, that it's going to be followed by a series of racist text messages that message that mentioned his co-workers in the OK, well, you'd expect him to complain in April then. But he waits nine months of silence. Wouldn't the inference be OK that the racial problem is is over? It's it's it's done with. So I think you've got a problem there of explaining that. And the district court did not rest on causation. We're not we're not going to go there. But I do wonder, how are you going to if we give you a remand, how are you going to prove causation here? Do you have a basis for showing causation given that very long lag time? So I think there's two different lag times, I think, that you're talking about. There's nine months between when the last text message is sent and when he reports the supervisor. It can be explained by the change in the call's position during that period in time. And the very fact that the county responded to his complaint by immediately investigating and obtaining the call's resignation based on his complaint means that the importance and the significance of what happened to him and what she was doing didn't disappear over those nine months. For whatever reason, it took him to get up the nerve or to make the decision that he needed to report McCall at the time that he did it. The county, at least, still believed that it was an important complaint that was worthy of investigation and that was worthy of terminating a very serious, very senior level official at the jail. All right, why don't we hear from Ms. Lamb and then we'll get you back. Did you reserve time for rebuttal? I meant to and I did not, Your Honor. I would like to reserve two minutes if it's not too late. Not not a problem. Thank you. We've gone over so we'll have no problem going over further. Ms. Lamb, whenever you're ready. Good morning, Your Honor. Catherine Lamb from the United States. In assessing protected opposition conduct under Title VII's anti-retaliation provision, a court considers whether an employee had a good, safe, reasonable belief that he opposed workplace discrimination because of an individual's race that violated Title VII's anti-discrimination provision or could do so if repeated. If I could, if I may, if I can start with the should we view the associational discrimination theory that was brought up on appeal after you filed your amicus brief as either waive or forfeited? What would your argument be to that? Well, Your Honor, we've not taken a position on waiver or forfeiture. However, I would not say that we raised the question of discrimination premise on Mr. Kondersky's association with his biracial relative in the first instance. That was one of the express grounds on which the district court made its decision and on which the district court made a significant legal error in considering the claim to be practically foreclosed as sufficient to support a good, safe, reasonable belief that an unlawful employment practice had occurred. So from our perspective, the issue was raised by the district court. And we also believe, as we noted in footnote five of our brief, that this this theory was addressed in plaintiff's opening brief, certainly as it is plain from the face of Mr. Kondersky's complaint that he experienced harassment because of his interracial association. What's the proper test for determining whether an employee has a reasonable belief of a severe or pervasive conduct? Well, ultimately, the question is whether the person has a good, safe, objectively reasonable belief. There are different tools we could use to assess what might constitute that belief, certainly looking to Title VII text, the case law interpreting, the statute, the EEOC's guidance all can help us understand whether or not an individual's belief is objectively reasonable. I would also point to terminology from a Seventh Circuit decision that the EEOC has adopted. It's a case called Magyar versus St. Joseph Regional Medical Center that talks about whether an individual has complained of conduct that was falls within the category of conduct prohibited by the statute. So that helps us as well to understand whether there might or might not be a good, safe, reasonable belief. Ms. Lamb, my concern is that I understand that the impulse here, but two of your positions here risk going beyond the statute. One of them is this one, that any conduct that falls within the category is going to be enough. It doesn't have to be within striking distance of severe or pervasive. And that that would seem to go well beyond, you know, changing the terms or conditions of employment. It would seem to turn the statute into a general workplace civility statute, which the Supreme Court says we're not supposed to do. The other the other way in which my concern is you go beyond the statute is your harassment in progress argument. I think Judge Niemeyer has a point in Boyer-Liberto that if it's in progress, it hasn't yet changed the terms or conditions of employment. And so there are good policy reasons, but I'm not sure how you can say that it comports with the statute to say that something that has not yet risen even to a reasonably believable that it would be severe and pervasive could nonetheless be protected activity. Well, Your Honor, I think if I and I hope I get this correctly, the first piece of your question goes to whether our position, which is essentially effectuating this circuit's good faith, reasonable belief standard, might go beyond the scope of Title VII. We think it doesn't. Every court of appeals and the EEOC has adopted the good faith, reasonable belief standard. I think a good faith, reasonable belief, but you seem to say anything within the category will satisfy a good faith, reasonable belief when you cited that seventh circuit test. And oh, and I apologize if that was confusing, Your Honor. I certainly I was trying to provide a gloss on what might help us understand what what will suffice to establish a good faith, reasonable belief. But the core principle that we forward in our brief is that that in assessing whether or not there is a good faith, reasonable belief, it must be tethered to Title VII. So the question is, at bottom, whether or not someone experienced discrimination because of such individual race. That is the language of Title VII anti-discrimination provision. And the assessment always must be tethered to that. So let's talk about the facts here. We have one statement, the monkey on the head, very offensive person at the time is not a supervisor. January, February 2014. Then we have either, you know, we can argue about the February 10th text, but then there's a February 28th text with three offensive images attached to it, but not images. Neither of these is referring to an interracial relationship. And then we have another text in April. But then we don't have a complaint for nine months after that. So I'm having a hard time understanding if we have three or four instances, only one of them appears to refer directly to the plaintiff. And then this long gap or cooling off period. How is it reasonable to say that at the end of this year plus period, one can reasonably believe it's severe and pervasive? It's almost like it's cooled off and gone away by that point. Well, Your Honor, I think it's important to look back to the text of Mr. Kendrick's written complaint. Not only does Mr. Kendrick's complain about it's extremely offensive, racist comment using a slur describing the relationship between him and his grandniece, but he also said that not long after those comments, he began receiving the text messages, which continued for a period of time. So tethering those text messages, the instigation of that conduct. To this initial slur. And then he also says that I believe that since that time, and I'm just quoting from this is the record, 675. Since that time, I have been harassed and I feel that my existence at the ACJ is being threatened. I believe I'm in a hostile environment. I will be disciplined, harassed and possibly ridiculed. And then he goes on to describe other conduct, particular adverse actions in his employment, including losing access to certain work materials, changes in his schedule. All right. But nothing after nothing after April 2014 is alleged to be racial harassment. It could just as easily be a personal disagreement. And Your Honor, I guess what I'm the way the way in which this is framed in Mr. Kendrick's complaint, he he tethers these adverse impacts and as well as the text messages to this initial instance of racial harassment. So certainly it seems to be from the face of Mr. Kendrick's complaint that he is tethering the two together. Subjectively, he's doing that. What makes that objectively reasonable? Well, the question is whether it would be objectively reasonable to believe that this could constitute a hostile work environment that has taken place or that could do so if repeated. No, no, no, no. So separate out those two things. We're certainly in agreement and a hostile work environment that has taken place. We have to discuss separately whether we want to adopt this harassment and progress theory that you were advocating, but that's at odds with, as I suggested, Judge Nehemiah's reading of the text of the statute. So talk about the first piece first before we get into the disputed harassment and progress theory. So whether or not one could reasonably believe that a hostile work environment has taken place. Yes, that's sufficiently severe, pervasive. Comments, not that the individual comments, but that collectively these three comments or one comment and two or three texts followed by a nine month gap amounted, one could reasonably believe that amounted to a sufficiently severe, pervasive, hostile work environment. Well, Your Honor, I'm a bit hesitant to break out one comment versus the other allegedly racist behavior that was going on, given the purposes of the statute, which are to encourage employees to come forward about possible unlawful discrimination without fear of reprisal. I think as the district court observed, Mr. Kandorski was right to report this, and it would be quite odd if Mr. Kandorski was right to report this alleged discrimination that seems to have ultimately led to Ms. Nicole's removal from the jail or her departure from the jail and then to say this conduct was unprotected. Nevertheless, this court in Castleberry and the Fourth Circuit Envoy Laberto acknowledged that the use of racial epithets can by themselves be enough to support a hostile work environment. That would be a violation. How many? I mean, you're not taking the position that one or two uses, at least by a non-supervisor and not connected with threats, as in Castleberry, automatically qualify as a sufficiently severe, pervasive, or one could reasonably believe. You know, pervasive has to mean something more than one or two, at least by a non-supervisor and unconnected with work threats. Well, Your Honor, as this court clarified in Castleberry, the standard is severe or pervasive. A badger either can get the plaintiff across the finish line in a hostile work environment, but again, that is not what we are looking at here. We are considering a retaliation case in which the plaintiff's good faith, reasonable belief is what we consider. So no one has to get across the finish line. You need a reasonable belief that it is within striking distance of severe, right? Or a reasonable belief that it's pervasive. I mean, so the reasonable belief is still tethering it somewhat close to what the underlying standard is. Is the EOC's position that a complaint about a single comment would satisfy that standard as opposed to, let's talk about the separately, the harassment progress standard? Well, Your Honor, speaking for the Department of Justice, I, the, the standard is whether, the standard is whether or not the individual could have a good faith, reasonable belief that they experienced a hostile work environment. I think to disaggregate the totality of what the plaintiff experienced and reported is somewhat improper under that analysis. There's no basis for disaggregating one act versus other ongoing acts that the individual reported all at once, tethering it all to a single course of harassing discriminatory conduct. That would seem to run in contravention with the purpose of the anti-retaliation provision as this court and the Supreme Court have noted. Is there anything in the records that would indicate whether Ms. Wise, that her, her consideration of black and white association was wrong? Let me say, I know starting out as a woman lawyer in the late 1960s, when there were certain lawyers in Wilmington who expressed their position that women shouldn't be in the law, that the fact that they didn't say it to me every day did not indicate to me that in any way had they changed their opinion. Well, your honor, I would have to defer to plaintiff's counsel about what there is in the record on whether Ms. McCall ultimately saw the light. Certainly it's significant here that Mr. Kendersky may not have known what was to come or what the ultimate purpose was of Ms. McCall's comments and that she may at any time have continued or escalated her pattern of behavior toward him, particularly as she was elevated to a, an even more senior position at the jail. Let me ask you a question just on, on the law under an associational discrimination theory, which has been adopted by four circuits. I believe it's cited on pages 14 and 15 of your, your brief. Are there any outer limits on how far removed the association can be? No, your honor, and first I would note that the correct assessment here, we think the term associational discrimination is a little bit inapp, although it's certainly a term that some courts have used, because ultimately in these decisions we cite by the fifth, sixth, um, second circuit, what the court is ultimately talking about is the core title seven question of whether or not an individual experiences discrimination because of such individual's race or his or her own race. So the core question is not whether the two people involved in the interracial relationship are closely related, casual friends, what have you. It's about what the type of discrimination was. Is it the kind that the statute apprehends? That's the title seven question. So, no, we do not think that there is any level of connection that is too far or so close that it's inherently going to trigger the statute's protection. It's just that core title seven question of whether or not the discrimination was caused because of the person's protected category. Okay. Thank you very much. Any further questions of my colleagues? No. No further. Good. Um, we'll hear from Ms. Scott. May this lead the court, Ms. Coleman, Ms. Lamb, Ms. Levengoof. I'll first speak about waiver. The issue we have here is that Mr. Kondersky has waived his right to appeal the fact of the entire case because he has failed to preserve a requirement element of his burden of proof, and that is causation. Mr. Kondersky. The one question I have on the waiver, they file an opening brief, the other side, then an amicus brief is filed. Well, first of all, the district court did deal with the issue. Then the amicus brief was filed by the government only on that issue. And then you filed your answering brief. And then the reply brief of Ms. Coleman responded to what you noted in your answering brief and picked up on the associational discrimination issue. So, in what possible sense were you prejudiced by the, by our dealing with this issue? I begin with, Your Honor, that the prejudice is not the standard in terms of waiver. The standard that this court has long held is that an appellant cannot raise an issue for the very first time on appeal. They must have, they must only raise issues that they presented at the district court level, and they may only present issues in front of this court that they have presented in their opening brief. But there are exceptions for significant policy matters. And so we have discretion to deal with the issue or not to deal with the issue. And it seems that the government is saying to us, this is an important issue, regardless how this case comes out, we would like you to join the 2nd, the 5th, the 6th, the 11th circuits in saying that there can be such a thing as discrimination against an individual for that person's association, associating that him or herself with a member of a protected class. Your Honor, you're, it sounds to me as if you're specifically referring to the issue of associational theory of liability waiver, because we have three arguments, three different areas where we are asserting waiver exists to simply focus on the associational theory. Well, I want to, I want to deal with that first, because I realized that you're going to, you're going to talk about causation and you can certainly bring that up and, but in that case, well, we'll deal with that when we get to it, but let's just deal right now with split it up to associational discrimination. How are you prejudiced in any way by dealing with this issue, which the government tells us? And I agree personally, that is a significant issue that it would be right for our court to at least deal with regardless of the outcome of this particular case. Because it was never addressed at the district court level. It was, this was not a part of the pleadings. This wasn't a part of discovery. It wasn't a part of any deposition. There was no evidence on this. If we had known that there was going to be any sort of argument on this, we certainly would have framed our motion for summary judgment differently. We could have included additional information in that factually could exist. Are you sure it's not part of the district court opinion? I don't know where. No problem. I'll just say, are you sure this is not part of the district court opinion? Well, I agree that the district court mentioned it in its opinion, but my point, but I think that the court did it in an abundance of caution sort of thing. It was never raised by Mr. Kondersky at the district court level. And the parties didn't brief it. The parties didn't, we didn't include any factual record that would support this sort of thing. And there is real harm because one of the things that would have, that could have been addressed is the fact that Mr. Kondersky in discovery, in his deposition, never contended that this letter had anything to do with his biracial grandniece. It simply wasn't on his radar. He did not in reality have a belief. We have this through the record, we don't have it in the record because this wasn't an issue. And this is why this court has long held that you can't raise an issue for the very first time on appeal because there is prejudice, because of the fact that the party. What's the prejudice to you because you had a full and fair opportunity to answer the government to make this brief and the district court did deal with it. And it, when you come back to the source, it almost, you've got a person making a comment about a monkey on your, carrying a very racist comment. And you're saying in your brief that it was a harmless zoomorphism on page 21 of your brief rather than a racist remark. It doesn't seem like this, this is a zoomorphism. This is one that really hits at the heart of a very racist incendiary statement. Well, Your Honor, the problem that we have here, and I'll come back to it, is the idea that it is only raised by a mean guy. Ms. Coleman admitted in her argument, initial argument here, that she didn't raise this theory of liability in her opening brief. And it really would be such a stretch to say that based upon a meek guy only that- Do we have the discretion to consider it? I believe you do, Your Honor. But the question is, is it really sound policy to do so when the precedent of this court has long established that a meek guy only cannot create the issues that are presented in a case? The precedent of this court is that, yes, typically it is waived or forfeited depending on how it's presented. In other words, if you know what the issue is and you intentionally say, I'm not going to deal with it, that's a waiver. If you just don't bring it up, it's a forfeiture. But we have the discretion to deal with substantive matters of policy, especially in this case when it's brought up in a very good amicus brief by the government. They're already in a causation argument? So, I'm not sure if you're asking me to answer that. No, I'm just, you've got something. The waiver of the argument, to me, is difficult. There clearly may, you can argue waiver of causation or something else, but the issue has been joined. Again, you may still win, but for me- Why don't you move on to causation? Yes, Your Honor. So, focusing on the causation waiver issue, this is an employment case. The McDonnell-Douglas test squarely applies. Mr. Kondrowski knew this because he briefed it at the district court level. He may be- But the district court dealt with it only in a footnote, correct? It specifically said it need not address the issue of causation. Well, but it still addressed it in a manner. It didn't base its ruling upon it. But certainly, the district court, along with Mr. Kondrowski, recognized that the McDonnell-Douglas test controlled. And in this case, there are two prongs Mr. Kondrowski had to satisfy. He knowingly waived the second prong by not preserving it in his appeal and not addressing it in his opening brief. The standards of this court looking at an appeal from a grant of summary judgment is de novo review, plenary review. And that this court has established that the decision of the district court can and should be affirmed for any reason, as long as that reason is supported in the record, even if it is a reason not relied upon by the district court. So, Mr. Kondrowski's argument is incorrect in saying that the district court didn't address causation. But the district court specifically said it need not address the issue of causation. And that's a quote. It is a quote, Your Honor. And then it goes on to explain why causation is still not satisfied. The court found that there was not temporal proximity between the submission of the letter and the adverse employment. Don't we have the discretion in this area, too, to say that we don't see prejudice? The matter seems to have been adequately met by both sides. And therefore, whether there is a waiver or not, we want to hear this and decide it. We have that discretion, don't we? Of course, Your Honor, you do. But in this instance, it's even less than what we have in the discretion that could exist in the associational theory. Because here, Mr. Kondrowski did not present the issue at all. At least in the associational argument, it came up through the amici. And Mr. Kondrowski raised it in his reply brief. But here, it's just fully waived. There's just nothing. But you're talking about causation being waived. But all we have from the district court is page 4 of footnote 1. It need not address the issue of causation. And then all the court's assessment is that said, there was a seven-month gap. Usual courts will dismiss as a matter of law. And then two citations with parentheticals. But the court said it wasn't addressing it. So why did they have to say anything in response to an issue that the court had bracketed in a footnote? Because the standard of this court reviewing a grant of summary judgment is de novo review of the entire record. And the entire record includes causation. We have a full test, McDonnell Douglas. It is not, excuse me, Mr. Kondrowski cites to no precedent where we have an employment case that has a strict one-two-prong test that he must satisfy where this court has said, oh, we're just going to allow you not to address one of the two prongs. All right. Let's assume we don't agree with you on the causation. Can we talk some about protected activity? I mean, do you have any basis for, do you concede that associational discrimination can violate Title VII? And do you concede that there's no substantial relationship requirement? I'm sorry, Your Honor. Could you repeat that? Can associational discrimination violate Title VII? Ms. Liebenduke is handling the substantive argument on the associational theory. Okay. And the substantial relationship issue as well. All right. I'll leave that to her then. So focusing on the protected activity, my point begins with asking the court to look at that Mr. Kondrowski has made one complaint. It's found in this April 2015 letter. The law on protected activity requires that what he has to establish that his complaint fits squarely within the four corners of this letter. The precedent of this court requires that he has to identify an employment practice that has been made illegal by Title VII. This letter must specifically set forth what that illegal employment practice is. This letter has to specifically complain of an employment practice that is made illegal by Title VII. And frankly, this letter doesn't do that. Ms. Scott, Ms. Coleman hangs a lot on the texts that were attached to the letter. Is there any basis to say that we can't look at those texts to help understand the letter? Your Honor, before you get to that, the first thing you have to look at is Title VII retaliation requires that you're engaging in conduct that would be protected by Title VII and that you're doing it on behalf of a class of persons that would be protected by Title VII. So we don't have that in this instance. Because while Mr. Kondersky complains of harassment, hostile environment, and retaliation, he's only referring to himself in that category. And he gives examples of that. Now, when we move to the text message, and I'll try to get to the specific answer to your question rather quickly by saying that he, because he doesn't invoke in his letter a class of persons that would be protected by Title VII, he doesn't have standing to pursue this case. So even, so now, if he did have standing, then you would look at this one-time comment and the text messages. And with regard to the text messages and also this comment, you have to look at the standard that this Court has long articulated as well as the United States Supreme Court. And that is that it is required that this, it's a very high standard. It has to be severe or pervasive. The contact has to be so supreme and extreme that it would fundamentally change the working environment, both objectively and subjectively. And here, neither the one-time comment, and specifically, as you ask, these text messages don't do that. The Court has already spent a lot of time discussing the fact that these text messages have a- To win on a retaliation claim, does a plaintiff need to show that the conduct complained of with the benefit of hindsight was actually severe or pervasive or was reasonably perceived as a violation of Title VII? It can't be either. If it is, if they're reporting something that is severe or pervasive, they would need it. But also, they have to, if they do not need that, then they have to have established that one would reasonably find that. But yet, the precedent of this Court supports that that's not the case here. If you look at Curry v. Kramer, this Court found that when someone was, they worked at a religious school, and they made a complaint that they were opposing, quote, illegal employment practices. This Court found that that's, they were not engaging in anything that was protected by Title VII. Similarly, in Barber v. CSX, this Court found in another precedential decision that it is not enough to be complaining that you're being untreated fairly, which is what Mr. Kondersky is complaining about. So in Barber, this Court found that there's no protective activity. The same thing is true with Mr. Kondersky. He did not establish in any way that he met the, anything that reaches to that level. But what does he, what does he have to meet to make a valid claim? He has to, I'm sorry, Your Honor. You go ahead, tell me what you think, and then I'll tell you what I think. He has to be bringing something that would come within the ambit of Title VII. This Court found if you're, if you're talking about, I think it was in Curry v. Kramer, if you're just saying you're imposing illegal employment practices, you're not, you're not invoking anything of Title VII. It doesn't bring up, if it were an age discrimination, you have to invoke, I'm complaining about age. I've been discriminated because of my age. So this Court still requires that you meet these minimum standards of, of putting. Could a rational person have a reasonable, good faith belief that the comment about carrying a monkey on your hip is, violates Title VII? Not, not, no, Your Honor. For one thing, this is a one-time comment, and this Court has long held in the United States that one-time comments associated with nothing else, as, as we have here, that that's not going to be enough to create pervasiveness. So what about the, as Judge Bebas said, what about the text messages? Which are pretty, I mean, some of these things that, these pictures that were sent out were pretty demeaning of African Americans. Yes, no doubt, Your Honor. And they would, they would fit within the category of crude tastelessness, inappropriate conduct, comments rather. There are no racial epithets that are used with this. There is no use of the N-word. Anything that would trigger something that would reach the level of severity that the United States Supreme Court has long required to establish something that could be pervasive enough. And also, the timing of these things are relevant because contrary to what Ms. Coleman had said, when the Court looks at the record, these text messages, and we're looking at four, maybe five in number in total, they, the first one began one year and two months before Mr. Kondrowski was discharged. And the last one- Like the pictures with the text, I see 10 pictures in the, in the record here. And the, the majority of them have nothing to do that are racial. And, and I believe that the Court already had spoken about, there, there are five at in any way could refer along to black people. Ms. Scott, let's talk about this. So you could count five, six, seven, one of them's a duplicate. But we have, we have a statement in January, February that's offensive as to Mr. Kondrowski himself, right? The monkey on the hit point. But then we have these statements that are offensive in relation to some co-workers who are named, who I gather are black co-workers, right? Can we add these things up? Do they make it a hostile work environment for him? Do they make it a hostile work environment for the co-workers? What's the relationship between the, the, the racially offensive comment as to him and his grandniece, and then the racially offensive text as to the co-workers? I'm trying to figure out how this adds up under Title VII. Well, Your Honor, it doesn't add up under Title VII. That Mr. Kondrowski, again, we focus on what he actually reported. He does not report a hostile work environment towards himself because of these text messages or the comment. He reports a hostile work environment to himself because of his association with another white man. So that's not going to get him within Title VII. And while someone is able to make a report that would be protected by Title VII if they were reporting hostile work or discrimination or retaliation towards black people, that is possible. Mr. Kondrowski is not making that report. He makes no comment about these text messages other than that they are racially inappropriate. So that's what his report is. Now, calling something racial is a description of race. It is not an inherently discriminatory connotation. It's not like the N-word, the C-word, or anything that this court has recognized as being on its face in violation of Title VII. Calling a black person a monkey doesn't hit that level? You know, Your Honor, in this instance, we are talking about a reference to a small child or baby who is not an employee. Title VII, to begin with, is only protecting against workplace discrimination or retaliation. And we don't have that here. The court has long held that Title VII is not a civility code. And referring to—there's no precedent in this court that referring to a small child as a baby monkey on your hip has ever been protected by Title VII. It would be a real stretch to hold so in this case. Wait. When I asked about this, you said this was Ms. Lievengut's province and we've been waiting, but it seems like this is shading over into her argument about whether he has you know, a right to be free of these kinds of statements on the basis of his relationship with his niece. Your Honor, I'm not arguing—I'm arguing the text messages simply don't—excuse me, the one-time comment is just not protected generally. I think that the associational theory is a unique and distinct argument. So I'm not trying to move into Ms. Lievengut's associational theory argument. It does seem like you're taking a very divide-and-conquer approach towards all these incidents and the other side is taking a lump them all together and they're different, but how different are they? Are they different enough that we can't like consider them collectively? I think that it—first of all, I think if you consider them collectively, it makes no difference because on the one hand, we have a comment made over a year before. We have a beginning of text messages made a year and two months before. In all the one-time texts, you can't solely lump them together because they are different events. The one-time comment is said one time and it is simply a comment followed by no action whatsoever other than a chuckle. And so this Court, the United States Supreme Court, has a great deal of precedent that talks about civility codes, crude tastelessness, inappropriate comments, that that's not going to be enough. And so when we just have the one-time comment, as offensive as it may be, that in itself cannot reach the level of being a protected activity. I think we've hit all these issues with you, I believe. Should we go to Ms. Lievengut? Your Honor, there are—yes, that's fine, Your Honor. We do have raised in our brief the issue of causation and the fact that, Mr. Kondersky, we've established a legitimate non-discriminatory reason for discharge. It's far more detailed in the brief in terms of Mr. Kondersky violated clearly established policy— And we've got that. That was dealt with well in your brief. And I don't know if I have any questions on the causation issue. We did deal with the waiver of causation issue, but that's about it. Right, Your Honor. With that, I will conclude my time and turn things over to Ms. Lievengut. I will mute the device while we change places. Great. Thank you. Ms. Lievengut? May I please report? Frances Lievengut on behalf of Allegheny County. I'll begin today by speaking about the perception theory of retaliation. In order—Mr. Kondersky argues even if his complaint or his letter didn't amount to retaliation, he still believes that the warden perceived this to be a sort of hostile work environment, and therefore he still has a viable claim. And the problem with this argument is that the only thing in the record that Mr. Kondersky can point to that the warden perceived this to be a report of something illegal, of something that's made illegal by Title VII is, one, that the report took the letter seriously, and, two, that the warden referred the letter on to legal counsel. Would you agree that the conduct—you don't have to show that the conduct necessarily violated Title VII. Isn't that correct? Under a perception theory, no. It's based on a mistaken belief that the decision-maker actually perceived that report or that letter to be a violation of Title VII. And to mention— Well, I think the test, at least what the government tells us the test, is for an employee. For an employee— To hold an objectively reasonable good faith belief that the conduct violates Title VII. Under a retaliation claim, yes, that's correct. But if we're talking about a perception theory of retaliation, in that case, the employee is admitting that their letter doesn't amount to a protected activity. But they're saying that because the employer perceived it to be that way— No, I'm talking about the test is with the employee, right? The employee reasonably believed that the employer perceived it to be a violation? No, that the employee holds an objectively reasonable, one, good faith, two, belief that the complaint of conduct violates Title VII. Yes, when you're dealing with a retaliation claim, that's the correct standard. But when you're, when we have this perception theory argument mixed in with it, the focus is on the employer's subjective intent when they decided to take the adverse action. And in this case— The perception theory, basically, I see what you're saying. Yeah. Back to the employer, that is, in Fogelman, we said that we accepted a plaintiff's argument that he could bring a retaliation claim because, I think, quote, even if he was not engaged in a primary protected activity, his employer perceived him to be so engaged. Correct, Your Honor, yes. Is this case, I mean, to what extent is this case about a perception theory, however? I don't believe that the perception theory applies. I'm simply bringing it up because it is brought up in Apelli's opening brief. And our position is that the perception theory doesn't apply because there's no evidence to prove that the warden perceived this to be a violation of Title VII. And also, causation is a very crucial element in the perception theory, because the perception theory is, depends on the decision maker's subjective intent when they took the adverse act. Mr. Regan, let's set aside— Go ahead, go ahead. Let's talk about what your friends on the other side were talking about, which is whether the employee reasonably believed he was engaging in protected activity. Maybe it doesn't exactly meet the level of severe or pervasive. Explain to us why you think this doesn't even come close enough for an objectively reasonable belief that he was complaining about protected activity. Sure, and the correct standard is an objectively reasonable belief. But that reasonable belief has to be tethered in the reality of a hostile work environment claim. Okay, but that doesn't have to be an actual hostile work environment. It just has to reasonably believe it meets the severe or pervasive standard. Why couldn't he do that here? Yes, and in the two subjects that I'm covering, in hostile work in progress and in associational theory of liability, it doesn't meet that standard. In one, hostile work in progress means that the employee reasonably believed at the time of reporting that there was a hostile work environment in progress. Okay, we haven't adopted that theory yet. Maybe we can get to that separately. Why doesn't this meet the standard of complaining about something that he reasonably believes has already risen to the level of a hostile work environment? He is not, because as Ms. Scott said, first of all, the actual Title VII violation has to be set forth within the letter, and it's not. He doesn't say, I believe I'm being harassed because of my association with my grandniece, or I believe that my coworkers are being harassed because of these text messages. So then if you just look at the one-time comment, the Supreme Court's precedent and this court's precedent is that a one-time comment not coupled with any type of threatening behavior or any type of other threat never meets that standard of a hostile work environment. So like I said before, it has to be tethered in some type of reality here, and this one-time comment, you can't make that jump. Why can't we read the other texts together? Because the other texts, at least two of the texts have clear offensive racial messages, and we can talk about whether the third one with Dennis Robbin does or doesn't. So why can't we read those together with the comment about his niece, grandniece, and the monkey on the hip? Well, they shouldn't be read together because in Mr. Kondraski's complaint, if you look at the actual letter, he's complaining about harassment towards himself. And so the reason why these text messages shouldn't be read in conjunction with the comment is because the text messages are not about Mr. Kondraski, they're about coworkers. So that's why we're keeping them separate, and that's why I believe they shouldn't be read in conjunction because Mr. Kondraski actually never complained that there was anything wrong with these text messages except for them being racially inappropriate. But he doesn't then go on to say that he believes his coworkers are being harassed or subjected to discrimination or anything of that sort. So that's why I believe we're keeping them separate here. And in terms of a hostile work in progress, when we are looking at the reasonableness of the employee's belief that something was in progress, timing does matter here. First of all, is it legally? Should we recognize that theory? Legally, I don't believe so, because as you, I believe Your Honor stated before, the hostile work environment has actually not occurred and is in progress. It hasn't yet changed the terms and conditions of employment. So I do believe that that creates an issue with this hostile work in progress theory, and it definitely creates an issue with what the EEOC, I believe, had argued that even a one-time comment, if repeated, if you believe if a one-time comment could be repeated enough to create a hostile work environment, then that should constitute a protected activity, or that should constitute a hostile work environment. I don't believe that that is consistent with a hostile work environment standard set by Title VII. And it turns out, and the Supreme Court has said that Title VII should not be a stability code. And I think that that's what it would turn it into. But even if this court were to adopt a hostile work in progress standard, I think it's instructive to look at what the court in Boyer-Liberto actually, the facts of that case, where the employee reported the very next day. And of course, if an employee reports the very next day, their reasonable belief that a hostile work environment was in progress is reasonable at that time, because you don't know what's going to happen the next day, the next month, the next week. But in Mr. Kondrowski's case, when he waited an entire year plus to report a one-time comment, and 10 months to report these text messages, you have the benefit of looking back through that time and seeing that there were no other race-based comments. There were no other text messages sent. So as each day went by, the reasonableness phased. So at the time Mr. Kondrowski reported, no reasonable person could have believed that he was reporting a hostile work in progress. And that's why I believe even if this court were to adopt this standard, which is not the standard right now, the facts of this case do not fit within it. And moving lastly to the associational theory of liability. And I believe a question was asked to the DOJ, what constitutes a good faith belief of an associational theory of liability here? And I think that to answer that question, it's instructive to look at the case where there the court was looking at a situation where two white employees were complaining of an associational-based hostile work environment. And there the court said, you don't have a viable claim because the conduct you're complaining of was not directed towards you. It was directed towards the African-American co-workers that you're associated with. And that's what we have here. The little monkey comment was not directed at Mr. Kondrowski. But the question becomes, could he as a Caucasian perceive that the comment was directed to him because he was associating himself and his family with his grandniece? So, in sticking with the Barrett v. Whirlpool case, it was a very similar situation where the employee complained that a co-worker said, how can you stand to sit next to that person? They smell. And that was that person's friend. And so, they had an association. And the court said, that's not enough because that comment was directed to him. But Barrett notes that that goes to the question, I'm quoting, that goes to the question of whether the plaintiff has established a hostile work environment, not whether he is eligible for protections of Title VII in the first place. Yes. And so, I believe that if the question is, can he bring a claim solely based on his association with his biracial grandniece? That has not been taken up by this court yet. And I do believe that the degree of association matters here because the degree of association correlates to the likelihood that somebody has been subjected to harassment simply because of that association. So, the more attenuated the relationship, the less likely it is that the harassment conduct is because of that relationship. He was about to take that child perhaps into his own home to raise her. Now, that seems like a pretty close relationship. And, again, what I'm saying is that I do, if the question is, does the degree of association- Okay. So, here we have a very close relationship because not only was it the grandniece, but it was a child who the plaintiff was considering taking into his own home. And this is something that, if we're talking about Mr. Kondruski's reasonable belief, again, it's not set forth in the letter that he believed that he was being harassed because of this association with his grandniece. That has to be in the letter for us to even- Does he have to get a lawyer to write the letter for him? He doesn't. But according to the court's precedent, that if you're dealing with a retaliation claim where you're looking at a letter, you have to stick with what is actually set forth in that letter. We can't extrapolate from that. And Mr. Kondruski can't later say, this is what the letter means. The subjective intent doesn't matter. It's what is objectively set forth in that letter. And the fact is, we can all read this letter, and Mr. Kondruski never says in the letter that he believes he was being harassed because of an association with his biracial grandniece. Very briefly, you want to address the causation issue? I thought you was going to- Did you want to do that or not? That was actually Ms. Scott's area. If you have questions, I'm sure she'll be happy to answer them. Fine. I think I have more questions of Ms. Coleman than I do of anyone else. OK. And with that, we rely on our brief for the remaining arguments. We ask that this court deny the appeal. All right. Thank you very much. Ms. Coleman, I think you asked for two minutes of rebuttal. We'll give you a little more than that because we gave approximately 37 minutes to the other side for a number of questions that we had. Thank you. I apologize. I'm having some technical problems and my computer display keeps shutting off. I don't think it's affecting my audio. We hear you well. The question is, when you strip it all away, we haven't even talked about the reason that Mr. Kanjarski was ultimately terminated, which was his role or in connection with a sexual harassment claim of someone else and how he handled that person's claim. Can he possibly win at the end of the day? Your Honor, he can because although the lower court did not decide causation, in our lower court briefs, we outlined extensively the circumstances that could lead a reasonable jury to conclude that he was terminated because of his engaging in protective activity. And I would point the court to our brief at JA, our lower court brief, it's at JA 355 to 70. But all of the optics looks really against him. He waits at least nine months to make a complaint after McCall becomes a supervisor. And then McCall is taken care of. And then seven months later, in November of when it is 15 or so, he has something that relates to him as to how he handles or mishandles a sexual harassment claim. And those appear to be good grounds for termination if they are true. The point, Your Honor, is that those are not true. The allegations are not true. And we explain why. But ultimately, this has to be viewed in the context of the entire jail environment. McCall, as we explained in our lower court brief, McCall was a larger-than-life figure at this jail. She was an extraordinarily powerful person there. The jail was aware that there was a faction of jail employees who followed McCall and who were intent on- But if she was an extraordinarily powerful person, it sounds like the system at the Allegheny County penal system, you know, the administrative system, handled the situation with her very expeditiously. And she ends up resigning. So there is a long history of complaints against Major McCall. And Mr. Kondrzewski's complaint is the one that finally pushed them over the edge and caused them to get rid of her. And as a result, there was an intense amount of retaliation that was directed towards Mr. Kondrzewski over the next seven months by people who were loyal to her and also to some extent by Deputy Warden Wainwright and Warden Harper. He was repeatedly harassed. The Warden Harper was warned by the jail's internal investigation that there would be retaliation against Mr. Kondrzewski by other employees. He never investigated that. He refused to respond to Mr. Kondrzewski's complaints of retaliation. And then ultimately, based on almost no evidence whatsoever, other than the contradictory stories of three employees, one of whom was McCall's chief lackey within the jail, Mr. Warden Harper said that he decided to terminate Mr. Kondrzewski within less than 30 minutes of him being made aware of these complaints. So causation is not just a matter of temporal proximity. Causation involves all of the circumstances in the case. And here, there's sort of abundant circumstantial evidence from which an inference could be drawn of causation and from which a jury could conclude that it was Mr. Kondrzewski's complaint that ultimately led to his termination several months later. And you can draw the connection between those two events. I think a reasonable jury could. And that's why this case, if causation were an issue, there is a reasonable, there is a question of fact that should be decided by a jury as to that issue. All right. Anything further you want to sum up with? I would, if I could. I wanted to point out, just respond to a couple of things that the county had said. Most importantly, with regards to the perception theory of retaliation, they had indicated that the only thing in the record that indicates that there was, that the county perceived Mr. Kondrzewski's conduct as retaliatory was that he had, that Mr. Warden Harper took the complaint seriously. That's not accurate. In fact, there's testimony from Deputy Warden Wainwright that Warden Harper told all of the chief administrators in a meeting that Ms. McCall was being investigated for racial intolerance and inappropriate racial comments. So the county perceived Mr. Kondrzewski's complaint to be a complaint about racial harassment within the workplace, and they treated it as such. So all of these, whether or not he had a lawyer draft his complaint and understood and set forth properly in the complaint all the elements that would be necessary for a hostile work environment claim, even if he submitted his complaint incorrectly, the county treated that as a complaint about racial discrimination that violates a toy type of setting. But didn't Warden Harper do exactly what you would have wanted him to do? He referred Kondrzewski's complaint to the county law department. Yes. There's no claim here that Warden Harper responded improperly to Mr. Kondrzewski's complaint. The problem is that that set off a chain of events within the jail. Her termination, her being forced to leave, set off a chain of events in the jail that led to my client being terminated for pretextual reasons. That's the claim. Nobody's saying that Warden Harper didn't respond appropriately in terminating his call. She should have. Is your argument in connection with what happened with Officer Tucker that on causation for the termination of Kondrzewski that it really wasn't dealt with by the district court? That is absolutely my contention. It was not dealt with. We briefed it to the district court. The district court specifically said that he did not need to reach that issue and he was not going to reach that issue. And that's why we did not raise it as an issue on appeal. There was nothing to appeal because there was no decision from the local court. Okay, thank you. Thank you very much. We spent a lot of time on an interesting case with a lot of facets to it and a well-argued case by all counsel. We'll take the matter under advisement.